COLUMBIA HOSPITAL FOR WOMEN
FOUNDATION, INC., et al.,
Plaintiffs,

v.

THE BANK OF TOKYO–MITSUBISHI,
LTD., Defendant.

No. Civ. 97–02988–CKK.

United States District Court,
District of Columbia.

Dec. 23, 1997.

Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, D.C., for plaintiff.

David D. Dibari, Washington, D.C. for defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case requires the Court to determine the scope of its power to issue a preliminary mandatory injunction against the Bank of Tokyo–Mitsubishi that would compel the Bank to release to the Plaintiffs $11.3 million dollars and a first deed of trust on real property that the Defendant holds as collateral. Because of the imminent harm that the Plaintiffs claim will follow if they do not obtain the relief that they seek, this Court ordered the parties to brief the issues on a highly expedited schedule.[1] Having carefully reviewed the pleadings and the affidavits in support thereof, the oral arguments presented by counsel at the court hearing on December 19, 1997, and the governing law, the Court is compelled to deny Plaintiffs' Application for a Preliminary Injunction.

## I. BACKGROUND

Plaintiffs in the above-captioned action are three not-for-profit corporations in the District of Columbia: Columbia Hospital for Women Foundation, Inc. ("Foundation"); Columbia Hospital for Women Medical Center, Inc. ("Medical Center"); and Columbia Hospital for Women, Inc. ("Hospital"). For over 130 years, the Hospital has provided specialized medical services for women and newborns in the Washington metropolitan

---

1. The Complaint and the Motion for Preliminary Injunction were delivered to the Court on December 15, 1997; the Opposition was delivered to the Court on December 17, 1997; the Reply memorandum was delivered on December 18, 1997; and a Supplemental Memorandum in Support of the Preliminary Injunction was delivered on December 22, 1997. The actual filing dates of the various pleadings differ from the dates upon which the Court received the pleadings due to the fact that the Plaintiff ignored the proper procedures for requesting that the Motion and other pleadings be filed under seal.

area. In 1988, the District of Columbia issued $25 million in variable rate demand/fixed rate hospital revenue bonds ("Bonds"). The District of Columbia, through its Trustee, American Security Bank, N.A., loaned the proceeds of the bond sale to the Hospital to finance its expansion and renovation. Under the agreement, the Hospital would pay the principal and interest on the Bonds when due. As a condition of this arrangement, however, the Hospital was required to provide a letter of credit to secure its payment obligations. Defendant Bank of Tokyo–Mitsubishi agreed to issue a satisfactory letter of credit in the amount of $25,513,699, upon which the Trustee could draw if the Hospital failed to pay the bondholders. Originally scheduled to expire on December 12, 1993, the letter of credit has been renewed subsequently on numerous occasions. The action before the Court challenges the validity and binding effect of two such extensions.

### A. The Pledge Agreement for $11.3 Million.

On January 10, 1997, Susan Hansen, the President and Chief Executive Officer of Columbia Hospital for Women, entered into an agreement with the Bank to renew the letter of credit. In consideration for the Bank's decision to extend the letter of credit, the Hospital pledged approximately $11.3 million in collateral ("Pledge Agreement"). At issue in this litigation is the power, if any, that Ms. Hansen possessed to bind the Hospital to the terms of the Pledge Agreement. Plaintiffs claim that the three boards-of-directors, whose approval under the by-laws is essential, never formally sanctioned Ms. Hansen's proposal to enter into the Pledge Agreement. The principal bases for Plaintiffs' attack are that the boards "approved" the Pledge Agreement without a quorum of members and that some members cast proxy votes—a procedure that the by-laws expressly prohibit.

### B. The Receiver Pendente Lite's Decision to Grant the Bank a First Deed of Trust on the Hospital's Property.

On March 4, 1997, certain board members filed an application in the Superior Court for the District of Columbia that was styled as an Application for Court Supervised Liquidation and Receivership. Judge Rafael Diaz appointed Dan J. Oldani as Receiver *pendente lite* until the court could conduct a full hearing on the application. In the interim, Mr. Oldani negotiated with the Bank to arrange another extension of the letter of credit, which was due to expire on April 3, 1997. Prior to finalizing any agreement, the Superior Court, Judge Ann O'Regan Keary presiding, entered an Order that explicitly conferred on the Receiver *pendente lite* broad powers "to enter an extension of the Letter of Credit." Mr. Oldani subsequently granted the Bank a first deed of trust on the Hospital's real property in exchange for a six-month extension on the letter of credit. After a full hearing, on March 28, 1997, Judge Keary determined that the court lacked jurisdiction to appoint a liquidating receiver because none of the jurisdictional prerequisites for liquidating a corporation existed. Accordingly, Judge Keary issued an Order that dismissed the application for liquidation and terminated the appointment of Mr. Oldani as Receiver *pendente lite* effective April 2, 1997. *See* Pl.'s Motion for Preliminary Injunction, Exh. 3.

Because many of the Hospital's board members resigned during the receivership proceedings, Judge Keary's Order compelled the Hospital to reconstitute its boards. The Hospital's current regime claims that it has made great strides to ameliorate the past board's inefficiencies. Despite the new board's nascent success, it confronts an urgent liquidity crisis. According to the Plaintiffs, because the Bank has tied up its greatest liquid asset, the $11.3 million reserved as collateral pursuant to the Pledge Agreement, coupled with an unexpected obligation to satisfy a liability to Blue Cross/Blue Shield that forced the Hospital to deplete its cash reserves, the Hospital cannot "remain in operation if it cannot have access to its cash and property." Pls.' Mot. for Prelim. Inj. at 10. With negotiations having collapsed, the Hospital now petitions this Court "to ease [the Bank's] needless restraints and thereby permit the hospital to survive." *Id.*

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A SUFFICIENT LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS TO WARRANT IMPOSING A MANDATORY INJUNCTION ON THE DEFENDANT.

### A. *The Calculus for Evaluating Preliminary Mandatory Injunctions.*

■ Initially, the Court notes that there is a sharp disagreement over what the Plaintiffs must demonstrate in order to obtain the relief that they seek. Typically, the Court examines four factors to inform its judgment about the propriety of granting a preliminary injunction: whether the moving party can demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *See CityFed Fin. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995); *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir. 1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842 (D.C.Cir.1977). Both in court and on their papers, the Plaintiffs have vehemently asserted that because they have made strong showings on the second, third, and fourth factors, they need only raise a "serious question" going to the merits in order to justify a preliminary injunction. Seizing on language in *CityFed,* Plaintiffs observe that "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed,* 58 F.3d at 747. This formulation, according to Plaintiffs, militates in favor of issuing an injunction because they believe that they have presented a sufficiently strong case on the second, third, and fourth factors to relax their required showing on the merits.

■ Plaintiffs' interpretation of the law of injunctions is myopic; it overlooks the extraordinary relief that they seek. As stated at the outset of this Memorandum Opinion, the Court is being called upon to issue a *mandatory,* not prohibitive, injunction. While even a motion for a preliminary prohibitive injunction should not be routinely granted, "[t]he power to issue a preliminary injunction, *especially a mandatory one,* should be 'sparingly exercised.'" *Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C.Cir.1969) (emphasis added). Although it is an observation almost too unremarkable to warrant comment, it appears that Plaintiffs have ignored the fact that the *CityFed* Court reviewed the denial of a *prohibitive* preliminary injunction.[2]

■ The party that moves for a mandatory preliminary injunction must do more than merely raise a serious question about the law under which its predicates the right of recovery. In such cases, "where a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite,* courts should be extremely cautious about issuing a preliminary injunction." *Stanley v. University of S. Cal.,* 13 F.3d 1313, 1319 (9th Cir.1994). Thus, "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997). As a rule, "[w]hen a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law *clearly favor* the moving party.'" *Id.* (quoting *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir.1979)) (emphasis added); *accord Martinez v. Math-*

2. Moreover, the specific holding in *CityFed* was that "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed,* 58 F.3d at 747. It is not as clear as

Plaintiffs assume it to be that *CityFed* can also be read to hold that a particularly strong showing of irreparable injury can justify a preliminary injunction even if there is a relatively weak showing of likelihood of success on the merits.

*ews,* 544 F.2d 1233, 1243 (5th Cir.1976).[3] Accordingly, the Court rejects Plaintiffs' invitation to dilute the burden they must bear in "clearly" demonstrating that the law and facts support their request for a mandatory preliminary injunction.

### B. The Balance of the Equities Militates Against Mandatory Injunctive Relief

#### 1. Irreparable injury

Plaintiffs' supporting affidavits suggest that if they do not get the relief that they seek, they will be forced to stop taking patients within two weeks. *See* Beaulieu Aff. ¶ 6. Although they do not mention it in their pleadings, Plaintiffs indicated during a conference call on Monday that they need the money immediately (over $4 million) to meet payroll by December 26, pay past-due vendors, and obtain precious supplies. The Plaintiffs claim that they cannot generate working capital through their present operations because the Bank has "effectively" prevented Columbia from dealing with any other lender.

The Defendant doubts the imminence or severity of Columbia's injury. First, the Bank points out that Plaintiffs have not attempted to secure alternate financing from other institutions. Thus, the Bank asserts, Plaintiffs have failed to demonstrate that they are "actually" prevented from obtaining money from other banks to short-circuit their liquidity problems. Second, the Bank attacks the Hospital for failing to act sooner. Notwithstanding Defendant's contention, Plaintiffs have adduced sufficient facts to permit the Court to conclude that they face irreparable injury in their present financial state.

#### 2. Balance of harms

There can be little doubt that the Bank would incur harm were this Court to order it to relinquish both the $11.3 million fund that it is holding as collateral as well as the first deed of trust on the Hospital's real property. The Plaintiffs claim, without providing sup-

porting documentation, that the Bank would not suffer greatly in the event that the Court entitled the Hospital to use the $11.3 million fund because the first deed of trust secures property purportedly worth $100 million—or at least, according to the public tax assessment records of the District of Columbia, the property is worth $56 million—far in excess of the Bank's contingent liability. Although this figure has been disputed, the Defendant likewise has not submitted any affidavit or evidence to refute this claim, and only has stated orally in a telephone conference call with the Court and Plaintiff that it has an appraisal for the property at $5.5 million. The Court views this evidence in equipoise in that neither side has provided the Court with support for their valuation of the property.

#### 3. Public interest.

This factor, above all the others, weighs heavily in Plaintiff's favor for reasons that are manifest and do not require much elaboration. The Hospital clearly performs a valuable service; it is a venerable entity that has faithfully served this community for over a century. The Bank would have this Court believe that to grant the Plaintiffs the relief that they seek would be to cast a shadow over the entire institution of banking. Despite such ominous prognostications, the Bank's public-interest argument is a conclusory and empirically dubious proposition. Balanced against the obvious public interest in seeing Columbia Hospital continue to operate, the Bank's argument fails on this factor.

#### 4. Likelihood of success on the merits.

##### a. The validity of the agreement entered into by the Receiver pendente lite.

The fatal error in Plaintiffs' attack on the validity of the agreement executed by the receiver *pendente lite* is that they conflate the jurisdiction of the Superior Court to appoint a *permanent* receiver under D.C.Code Ann. § 29–556(a) and that court's jurisdiction to appoint a receiver *pendente lite* under a

---

3. The Court notes that Plaintiffs rely on cases from the Second and Ninth Circuits to support their "serious question" formulation. Those cases, like *CityFed,* concerned a prohibitive injunction. The recent cases from these jurisdic-

tions that the Court cites—cases that specifically addressed mandatory injunctions—underscore the fundamentally different inquiry that courts perform when called upon to exercise their equitable powers affirmatively.

completely different statutory rubric: D.C.Code Ann. § 29–557(a).

 Section 29–556(a) provides: "The court shall have full power to liquidate the assets and affairs of a corporation...." It then enumerates a number of jurisdictional prerequisites that must be present before the court may proceed actually to liquidate the corporation. Notably, § *29–556 does not* provide that these factors must be present in order for the court to appoint a receiver *pendente lite*. Again, this section only lists the jurisdictional factors that the court must determine actually exist before it begins *liquidating* the corporation.

> Fundamental to this whole question is Section 29–557(a), which provides: In proceedings to liquidate the assets and affairs of a corporation, the court shall have the power to issue injunctions, to appoint a receiver or receivers *pendente lite*, with such powers and duties as the court, from time to time, may direct, and to take such other proceedings as **may be requisite to preserve the corporate assets wherever situated, and carry on the affairs of the corporation until a full hearing can be had.**

D.C.CODE ANN. § 29–557(a) (emphasis added). Distilling the language of § 29–557(a), the only jurisdictional prerequisite to appointing a receiver *pendente lite* is that the court has before it "proceedings to liquidate the assets and affairs of a corporation."

That is to say, the jurisdiction of the court to appoint a receiver pendente lite is independent of its jurisdiction to appoint a liquidating receiver. It is, thus, manifest that the temporary receiver in the case at bar had full authority to enter into agreements with the Bank on behalf of the Hospital. First, Mr. Oldani was appointed receiver *pendente lite* during a proceeding to liquidate the assets and affairs of the corporation.[4] Second, in its intermediate Order, the Superior Court explicitly authorized the receiver *pendente lite* to execute agreements that would preserve the assets and carry on the affairs of the corporation. Third, all of this was done during an interim period to permit the court to hold an eventual hearing. Although implicit, it is obvious that § 29–557 contemplates that there will be instances in which a court appoints a temporary receiver only to determine after a full hearing that the jurisdictional prerequisites in § 29–556 do not exist. Section 29–557(a) does *not* authorize the court to empower the receiver *pendente lite* to liquidate the assets and affairs of the corporation. Section 557(b) then goes on to provide that once the court has held a hearing and determined that it in fact does have jurisdiction pursuant to § 29–556, it may then appoint "a liquidating receiver or receivers with authority to collect the assets of the corporation." Thus, the D.C.Code draws a clear distinction between the power of temporary receivers and liquidating receivers.[5]

Moreover, it would appear that the Superior Court tacitly recognized that § 29–557(a)

---

4. Plaintiffs attempt to extricate themselves from the literal language of the statute by questioning the hermeneutics of the phrase "proceedings to liquidate." At bottom, Plaintiffs adopt a peculiar results-oriented approach to interpreting those three spare words. Under their theory, the proceedings before Judge Keary were not really proceedings to liquidate because the Court eventually determined that none of the jurisdictional prerequisites had been met. Such an interpretation strains credulity. Assume, for example, an action brought by a corporation's director ostensibly to liquidate the business pursuant to § 29–556(a)(1)(A), which provides the Superior Court with jurisdiction where the directors are deadlocked. Other members of the board, however, dispute whether there actually is a deadlock. If the court subsequently determines that no deadlock actually existed, does that somehow transform what was putatively a "proceeding to liquidate" into something different? The question must be answered in the

negative. Were it otherwise, corporate entities would shy away from conducting business with receivers *pendente lite* for fear that an otherwise valid contract will be voided if the appointing court later determines that a liquidating receiver is inappropriate. This result would contradict the purpose of establishing a separate statutory provision that governs the appointment of receivers *pendente lite*. It is clear that what animates § 29–557(a) is an intent to ensure that corporate assets are scrupulously preserved until a hearing can be had to determine the propriety of appointing a receiver.

5. The Court notes that the cases cited by the Plaintiff relating to powers of receivers involved common law jurisdictions and are therefore distinguishable from this jurisdiction which has a statutory framework for appointing receivers *pendente lite* according them certain specific powers.

permitted the appointment of a receiver *pendente lite* irrespective of any subsequent determinations about the necessity of appointing a liquidating receiver. By Order dated March 20, 1997, Judge Keary expressly granted Mr. Oldani broad powers to enter into negotiations in behalf of the Hospital with the Bank. In addition, the court provided that

> [i]n the event that any or all of the provisions of this order are modified, amended or vacated, by a subsequent order of this or any other court, such modification, amendment or vacation shall not affect the validity or enforceability of any agreement entered into by, or obligation incurred by, or mortgage, lien or security interest granted on behalf of, the Foundation, the Hospital or the Medical Center by the Receiver pursuant to the authority granted herein.

Judge Keary issued this broad grant of authority to the Receiver *pendente lite* even though she was in the process of determining whether or not the court had jurisdiction to appoint a liquidating receiver pursuant to § 29–556. Moreover, once Judge Keary determined that the prerequisites of § 29–556 were not present, she terminated the authority of the Receiver *pendente lite* prospectively. Based on this Court's own reading of the plain language of the statutes, coupled with the actions taken by the Superior Court, the Court concludes that Judge Keary had jurisdiction to appoint the temporary receiver, and all actions taken by the receiver pursuant to her intermediary Order cannot now be impeached collaterally.

b. *Whether the Hospital's pledge agreement of $11.3 million is valid*

The Bank defends against the Hospital's attack by referring to the law of ultra vires.

Plaintiffs correctly note that they are not disputing the legitimacy of the January pledge agreement because it was ultra vires. Under the DC Nonprofit Corporation Act,[6] no act of a corporation or conveyance of property shall be invalid by reason of the fact that "the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer." D.C.Code Ann. § 29–506. Ultra vires doctrine encompasses only corporate actions that are expressly prohibited by statute or by-law. Commentators have noted that though "[u]ltra vires acts are sometimes confused with ... acts within the power of the corporation but exercised ... without complying with required procedures ..., [i]n its true sense the phrase ultra vires describes action which is beyond the purpose or power of the corporation." HARRY G. HENN & JOHN R. ALEXANDER, LAWS OF CORPORATIONS § 184, at 477 n. 1. Not ultra vires, but the law of *agency* governs Plaintiffs' claim.

■ As a legal fiction incapable of autonomous action, a corporation can carry out its affairs only through the acts of its agents. The law is clear that a corporation is bound by the acts of its officers so long as they act with either actual or apparent authority. Defendant does not remotely suggest that Ms. Hansen acted with actual authority[7] when she executed the Pledge Agreement in January. Thus, the Court has limited its inquiry to the existence of apparent authority.

■ The D.C. Court of Appeals[8] has held that "apparent authority arises when a principal places an agent in a position which causes a third person to reasonably believe that the principal consented to the exercise

---

6. Defendant actually cited to the wrong provision governing ultra vires. The Hospital is a not-for-profit corporation, and accordingly, any ultra vires defense would be governed not by § 29–307, but by § 29–506.

7. Actual authority can be manifested in two ways: Express or implied. To be express, the authority must be explicitly provided for in the by-laws or by separate board action. (i.e., if the by-laws provided that the CEO could execute

pledge agreements unilaterally without consulting anyone). To be implied, the authority must be an obvious concomitant of other express, actual authority. Again, Ms. Hansen is not alleged to have possessed either of these.

8. Neither party has argued that a conflict-of-laws problem exists, and the Court presumes that District of Columbia law governs this case.

8

of authority the agent purports to hold." *American Bankers Ins. Co. v. United States,* 596 A.2d 598, 602 (D.C.1991) (quoting *Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 941 (D.C.1980)). Moreover, the Court of Appeals has clarified that "[t]his falls short of an overt, affirmative representation by a principal." *Insurance Management of Washington, Inc. v. Eno & Howard Plumbing Corp.,* 348 A.2d 310, 312 (D.C. 1975). In addition, this Circuit has held that "[a]pparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized" and to "believe the agent to be authorized." *Id.* Thus, the law imposes both an objective and subjective standard.

To determine the existence of apparent authority,

> [c]onsideration should be given, inter alia, to the actual authority of the agent, the usual or normal conduct of the agent in the performance of his or her duties, previous dealings between the agent and the party asserting apparent authority, any declarations or representations allegedly made by the agent, and lastly the customary practice of other agents similarly situated.

*Management Partnership, Inc. v. Crumlin,* 423 A.2d 939, 941 (D.C.1980); *see also* 2 FLETCHER CYC CORP § 449, at 415–16 (Perm ed. 1990) ("If an officer, for years prior to a certain act or contract, was held out by the corporation as its general agent, and as having authority to do such acts as the one in question, it is bound to the same extent as if authority were conferred in the most formal manner.").

The documents reveal that the President and CEO of the Hospital, including Ms. Hansen's predecessor, was the officer who signed all contracts relating to the Letter of Credit and its numerous extensions. This type of past dealing, which never provoked an objection from the Hospital from 1988 until 1997, provides the Bank with a reasonable expectation that the CEO and President of the Hospital has the authority to bind the corporation in contracts relating to the letter of credit. Moreover, at least one court has found that where a corporation appoints someone to act as "chief executive officer and chairman of the board ... [a]ppointing a person to such a position may, in itself, create apparent authority in an employee." *Federal Deposit Ins. Corp. v. Texas Bank of Garland,* 783 S.W.2d 604, 607 (Tex.App.—Dallas 1989).

■■■ A third party, however, cannot avail itself of estoppel if it actually knew that the agent purporting to represent the principal lacked actual authority. *See Williams v. Washington Metro. Area Transit Auth.,* 721 F.2d 1412, 1416 n. 7 (D.C.Cir.1983). On January 15, 1997—six days after the Board met and five days after the Hospital and the Bank executed the Pledge Agreement—Dr. Safa Rifka and a colleague drafted a letter, which was copied to the Bank that detailed the alleged procedural irregularities surrounding the January 9, 1997 Board meeting. The letter explicitly indicated that the Board meeting flaunted the Hospital's by-laws by accepting proxy votes and meeting without a quorum. Based on this letter, the Plaintiffs suggest that the Defendant had actual notice of Ms. Hansen's lack of authority to undertake the pledge agreement in behalf of the Hospital.

This argument has at least two problems. First, the Hospital's own counsel, Arent Fox, certified to the Bank in writing that the Hospital had complied with all by-laws and could lawfully execute the pledge agreement. Plaintiffs' attempt to minimize the significance of this letter by characterizing it as "boilerplate" language is unpersuasive. This jurisdiction has long adhered to the well-recognized "rule that the principal is responsible for the acts of its duly authorized agent." *Air Transport Assocs. v. Civil Aeronautics Bd.,* 199 F.2d 181, 186 (D.C.1952). Moreover, "the relation of attorney and client is one of agency and the general rules of law applicable to agencies apply." *Rose v. Silver,* 394 A.2d 1368, 1371 (D.C.1978). Here, the Hospital retained the law firm of Arent Fox to certify that they had complied with all corporate formalities and that any contract would have legally binding effect. On January 10, 1997 and again on January 29, 1997, Arent Fox made the following express representations on behalf of the Hospital to the

Bank: the borrower has the requisite corporate power and authority to carry on its business, *see* Aff. of Blasi, Ex. 7 (§ 2(a)); the borrower's execution, delivery, and performance of its obligations have been duly authorized by all necessary corporate actions, *see id.* (§ 3(a)); the loan documents have been duly executed and delivered by the borrower and constitute the legal and valid obligations of, and are binding on and enforceable against, the borrower, *see id.* (§ 4). By requiring the Hospital to obtain an independent legal assessment of their authority to execute the pledge agreement as a condition precedent to the agreement itself, they more than adequately discharged any duty they might have to ascertain independently Ms. Hansen's authority to bind the Hospital. What is more, even assuming that Dr. Rifka's December 15, 1997 letter should have alarmed the Bank about possible irregularities, the January 29, 1997 certification letter from Arent Fox mitigated any further duty that the Bank might have to divine the corporate propriety of the Hospital's actions.

 Finally, regardless of whatever legal deficiencies marred the Hospital's vote, the evidence establishes that the Plaintiffs have since ratified the Pledge Agreement. Just recently, for example, the Hospital executed the Third Amendment to Pledge Agreement. In that document, the Hospital ratified the following provision: "[T]he Borrower ... hereby represents and warrants to the Bank as follows ... the Pledge Agreement as amended by this Amendment and the Amendment constitute its valid and legally binding obligation enforceable against it in accordance with its terms." Blasi Aff., Ex. 13 (§ 5(c)(iii)). The Amendment also clarified that "all terms of the Pledge Agreement shall remain unchanged and in full force and effect." *Id.* (§ 13). It is a basic tenet of corporate law that an inquiry into whether "an officer or agent acted within his or her authority is often eliminated by the fact that the corporation by its acts has ratified the act." FLETCHER CYC CORP § 437.10, at 386. The District of Columbia Court of Appeals has held that for an unauthorized act to be

ratified, the principal must have knowledge of the act and may ratify the act impliedly, but the conduct that implies ratification must be conduct that is "inconsistent with any other hypothesis." *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 671–72 (D.C.1983); *see also Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456, 465 (D.C.Cir.1989). Although Plaintiffs claim that they continually voiced objections to the Bank, they fail to explain the language of the Amended Pledge Agreement. To be sure, for a court to conclude that a corporate entity ratified an unauthorized act, the intent "must be clearly established and will not be inferred from doubtful or equivocal acts or language." *Capital Dist. Physician's Health Plan v. O'Higgins*, 951 F.Supp. 352, 361 (N.D.N.Y.1997). Yet, *O'Higgins* and the other cases on which Plaintiffs rely turned on factual situations in which the trier-of-fact was required to infer from ambiguous conduct. Here, by contrast, the language of the Third Amendment to the Pledge Agreement could not be more explicit. Plaintiffs cannot disclaim the unambiguous language to which they acceded by claiming that it was the product of some Faustian bargain. Accordingly, Plaintiffs have failed to demonstrate that, based on the facts and law, they are clearly entitled to the relief that they seek.[9]

## III. CONCLUSION

Without eschewing or diminishing the profound sorrow and pain that will accompany the Hospital's plight or possible collapse, the Court simply cannot enjoin that which, as a matter of law, is not impeachable.

---

**9.** The Court notes that even if the Court applied the standard posited by the Plaintiffs, namely that they need only raise a serious question as to the merits, the Plaintiffs would not prevail.