**MORGAN STANLEY DW INC., Plaintiff,**

v.

**John E. ROTHE, Defendant.**

**No. Civ.A. 01–1065(RMU).**

United States District Court, District of Columbia.

May 22, 2001.

David B. Hamilton, Ober, Kaler, Grimes & Shriver, Baltimore, MD, E. John Steren, Ober, Kaler, Grimes & Shriver, Washington, DC, for plaintiff.

Neil Lawrence Henrichsen, Henrichsen & Siegel, P.L.L.C., Washington, DC, for defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### GRANTING THE PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

### I. INTRODUCTION

On May 11, 2001, John Rothe resigned effective immediately from his job as a financial advisor at Morgan Stanley DW Inc. ("the plaintiff" or "Morgan Stanley"). Mr. Rothe ("the defendant") immediately accepted a job with a rival company, CIBC Oppenheimer ("Oppenheimer"), thus setting the stage for a textbook employer-employee dispute about a covenant-not-to-compete.

On May 16, 2001, the plaintiff filed a verified complaint and a motion for a temporary restraining order and a preliminary

injunction.[1] The plaintiff, a Delaware corporation maintaining its principal place of business in New York City, brings this suit in federal court under diversity jurisdiction pursuant to 28 U.S.C. § 1332. The plaintiff alleges that on July 7, 1998, the defendant signed an Account Executive Trainee Employee Agreement ("the Agreement") as a condition of his initial and continuing employment with Morgan Stanley. The plaintiff now claims that the defendant has violated that agreement by taking files with him after resigning from Morgan Stanley and by contacting Morgan Stanley's clients to persuade them to sever their relationship with Morgan Stanley and transfer their accounts to the defendant's new employer, Oppenheimer.

The plaintiff asks for temporary and preliminary injunctive relief pending an expedited hearing on the merits before a panel of arbitrators pursuant to paragraph 10335(g) of the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure.

The defendant counters that injunctive relief is inappropriate for four main reasons: (1) this matter belongs in arbitration; (2) the plaintiff is unlikely to prevail on the merits in arbitration; (3) enforcement of the agreement would violate NASD rules by denying public customers the right to exercise their own investment decisions; and (4) money damages can adequately address the purported harms suffered by the plaintiff. *See* Opp'n to Pl.'s Mot. for Injunctive Relief ("Opp'n") at 19. Accordingly, the defendant argues that the court should deny the plaintiff's motion for preliminary-injunctive relief.

For the reasons that follow, the court will grant the plaintiff's motion for a temporary restraining order.

## II. BACKGROUND

In 1996, while he was in college, Mr. Rothe, 26, began working at Morgan Stanley's Washington office as an intern. *See* Rothe Decl. at 2. After graduating from the University of Maryland in 1997, he joined Morgan Stanley as a full-time sales assistant. *See id.* While he was a sales assistant, he obtained his securities licenses and registrations. *See id.* On June 1, 1998, Morgan Stanley gave Mr. Rothe a promotion and he joined the financial advisor training program. *See id.* About one month later, on July 7, 1998, he signed the Account Executive Trainee Employment Agreement. *See id.*

Several of the material facts in this case are not in dispute. The parties agree that on July 7, 1998, John Rothe signed and executed the Agreement. *See* Compl., Ex. A; Decl. of John E. Rothe dated May 17, 2001 ("Rothe Decl.") at 2. The parties also acknowledge that Mr. Rothe resigned from his position as a financial advisor at Morgan Stanley's Washington, D.C. office "effective immediately" on May 11, 2001. *See* Compl., Ex. B (Def.'s resignation letter to Mr. Jerry Castro, Branch Manager, dated May 11, 2001). As Yohannes Tilahun, the sales manager of the Washington office, states, "On May 11, 2001 at 5:15 p.m., Defendant resigned from Morgan Stanley *without prior notice* to join the Washington, D.C. office of CIBC Oppenheimer ...., a direct Morgan Stanley competitor." *See* Pl.'s Mot. for a T.R.O. and Prelim. Inj. ("Pl.'s TRO Mot."), Ex. A. (Aff. of Yohanes Tilahun ("Tilahun Aff.")) at 2 (emphasis in original).

In addition, although the parties disagree about how the Agreement should be

---

1. On May 17, the defendant filed an opposition to the plaintiff's motion, and the plaintiff filed a reply the next day. The court issued an order granting the plaintiff's motion for a temporary restraining order on May 18.

interpreted, applied, and enforced, they agree that its key provisions guaranteed the confidentiality of Morgan Stanley's records. They also concur that the Agreement prohibited Mr. Rothe from, among other things, communicating to third parties the contents of any records belonging to Morgan Stanley, and from soliciting customers he served at Morgan Stanley for a period of one year following termination of his employment with Morgan Stanley and within a radius of 100 miles from Morgan Stanley's Washington office. *See* Mem. in Support of Pl.'s Mot. for a T.R.O. and Prelim. Inj. Relief ("Pl.'s Mem.") at 2; Compl., Ex. A.

Beyond these points, the parties find little to agree on.

The plaintiff seeks a temporary restraining order to prevent what it calls the "unlawful misappropriation by Defendant John Rothe ... of confidential information pertaining to hundreds of Morgan Stanley accounts, representing in excess of $10 million in assets under Morgan Stanley management and over $250,000 in Morgan Stanley commissions over the last 12 months, and Defendant's effort to divert these accounts, assets and commission revenues" to Oppenheimer. *See* Pl.'s Mem. at 1. According to the plaintiff, Mr. Rothe, while still employed by Morgan Stanley, prepared to engage in, and now continues to engage in, the following acts that violate the terms of the Agreement: (1) removing, retaining, and/or copying confidential information pertaining to Morgan Stanley customers, and/or customer lists, including the names and/or addresses of hundreds of Morgan Stanley accounts formerly served by Defendant at Morgan Stanley; (2) disclosing and producing this confidential customer information to Oppenheimer; and (3) using this confidential customer information to solicit Morgan Stanley custom-

ers. *See id.* at 2; *see also* Ex. A (Tilahun Aff.).

Morgan Stanley claims that Mr. Rothe has committed the torts of conversion, unfair competition and breach of the duty of loyalty. The plaintiff also charges that Mr. Rothe has misappropriated Morgan Stanley's trade-secret customer lists and breached the express terms of the Agreement he signed as a condition of his employment. *See* Pl.'s Mem. at 2.

Morgan Stanley points out that in addition to containing the restriction on Mr. Rothe's future employment, the Agreement also called for the issuance of a temporary restraining order and a preliminary injunction to preserve the status quo pending the outcome of arbitration if the defendant breached the terms of his agreement. *See* Compl., Ex. A.

In consideration for Mr. Rothe's signing the agreement and becoming an employee, Morgan Stanley asserts that it agreed to, and in fact did, register and compensate Mr. Rothe, give him training and a job as a financial consultant and provide him with Morgan Stanley operational and sales systems, research and development, sales assistants and support, as well as the benefit of its reputation and goodwill. *See* Pl.'s Mem. at 3. Moreover, the company alleges that it provided Mr. Rothe with Morgan Stanley customers through: (1) "walk-ins"; (2) "call-ins"; (3) reassignments; (4) clients from Morgan Stanley-sponsored seminars; (5) leads from lists purchased from mail-order firms; (6) leads from Morgan Stanley national advertising campaigns; (7) leads from customer responses to national television campaigns; (8) leads responding to Morgan Stanley newspaper coupons; (9) leads calling Morgan Stanley's toll-free telephone number; (10) leads from blanket mailings to zip codes; and (11) other customer leads and sales advantages resulting from Morgan Stanley's

goodwill, reputation, and name recognition in the securities industry. *See id.*

Furthermore, the plaintiff claims that before the defendant joined Morgan Stanley, Mr. Rothe "had no experience as a financial consultant in the securities brokerage industry." *See* Pl.'s TRO Mot., Ex. A, Tilahun Aff. at 2. Mr. Tilahun also alleges that the company gave Mr. Rothe on-the-job training throughout his employment and, at all times, paid his annual registration fees with the NASD, the New York Stock Exchange, and the American Stock Exchange. *See id.* In addition, Mr. Tilahun makes the following specific allegations:

7. Despite Defendant's contractual and other obligations to Morgan Stanley, and despite the fact that Morgan Stanley is informing its customers where to reach Defendant, we have learned that immediately upon his resignation late May 11, 2001, Defendant began initiating contact with clients he formerly serviced at Morgan Stanley to solicit them to transfer their accounts to Oppenheimer.

8. In particular, our investigation has indicated so far that at least one client received a package of solicitation materials on Saturday, May 12, 2001 (the day after Defendant resigned), requesting that the client transfer its accounts to Oppenheimer.

9. In addition, our investigation has revealed that Defendant removed all of the original files of one significant Morgan Stanley client. That client maintained eight Morgan Stanley accounts with assets in excess of five million dollars. The original documents missing include account and taxpayer information, margin papers, correspondence, and check receipts, among other vital and confidential information regarding the client.

*Id.* at 2–3. The plaintiff asserts that all these alleged actions constitute violations of Mr. Rothe's agreement. Accordingly, Morgan Stanley seeks injunctive relief pending an expedited hearing on the merits before a panel of arbitrators in accordance with Rule 10335(g) of the NASD Code of Arbitration Procedure.

Countering that a temporary restraining order is not the appropriate remedy in this case, Mr. Rothe states that Morgan Stanley should seek relief from the arbitration process alone. He asks the court to deny the plaintiff's motion with prejudice and to direct Morgan Stanley to proceed promptly to arbitration of this matter on the merits before the NASD. *See* Opp'n at 4.

Mr. Rothe also argues that even if an injunction were proper in this case, Morgan Stanley's proposed order would violate the rules of the NASD. *See* Opp'n at 3. That is, the company's proposed order would include a restriction on Mr. Rothe's right to accept business from the customers at issue. *See id.* The NASD's Board of Governors, however, "just last week approved the publication of a rule interpretation making clear that the NASD rules prohibit 'any member firm [such as Morgan Stanley] from taking any action that interferes with [a] customer's right to transfer his or her account.'" *See id.;* Ex. 2 (NASD news release dated May 7, 2001).

Next, Mr. Rothe argues that the Agreement that Morgan Stanley asked him to sign was "overly broad." *See* Opp'n at 3. In addition, he attempts to cast doubt on the enforceability of the Agreement, which, he says, he "was forced to execute without discussion or negotiation several years after becoming employed by the firm...." *See id.* Moreover, Mr. Rothe states that "he developed the vast majority of his "book of business" through his

friends and family." *See* Rothe Decl. at 2–3. Thus, he takes issue with Morgan Stanley's claim to have a proprietary interest in these clients.

In sum, the defendant argues that the plaintiff has failed to make a showing strong enough to justify the issuance of injunctive relief. The court disagrees. Accordingly, the court will grant the plaintiff's motion for a temporary restraining order.

## III. DISCUSSION

### A. Legal Standard for Injunctive Relief

 ▪ The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction. *See Vencor Nursing Ctrs., L.P v. Shalala,* 63 F.Supp.2d 1, 7 n. 5 (D.D.C.1999) (Urbina, J.); *National Football League Properties, Inc. v. Coniglio,* 554 F.Supp. 1224, 1226 (D.D.C.1983). This court may issue a temporary restraining order or a preliminary injunction only when the movant demonstrates that:

> (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.

*Davenport v. International Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999); *see also World Duty Free Americas, Inc. v. Summers,* 94 F.Supp.2d 61, 64 (D.D.C. 2000). These four factors are not consid-

ered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. *See CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). Rather, the factors "interrelate on a sliding scale and must be balanced against each other." [2] *Davenport,* 166 F.3d at 361 (citing *Serono Labs. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998), *on remand,* 35 F.Supp.2d 1 (D.D.C.1999)); *see also WMATA v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *See Serono Labs.,* 158 F.3d at 1318. For instance, as to the first factor, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the movants'] view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson,* 39 F.Supp.2d 48, 50 (D.D.C. 1999) (quoting *Holiday Tours,* 559 F.2d at 843).

 A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing

---

**2.** When a party seeks an injunction to reverse policies that are already in place, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *See Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.,* 15 F.Supp.2d 1, 4 (D.D.C.1997) (ci-

tation omitted), *aff'd,* 159 F.3d 636, 1998 WL 203110 (D.C.Cir.1998) (table, text in Westlaw); *see also Alaska Excursion Cruises, Inc. v. United States,* 595 F.Supp. 14, 18 (D.D.C. 1984) (attempt to alter *status quo,* rather than preserve it, must be supported by showing that "the facts and law clearly support" such a change).

on the other three factors. *See Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits."); *National Wildlife Fed'n v. Andrus,* 440 F.Supp. 1245, 1256 (D.D.C. 1977) (enjoining further construction on dam power plant, despite dispute over irreparable injury, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury . . .").

■ If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC,* 56 F.3d 1497, 1506 (D.C.Cir.), *amended on other grounds on reh'g,* 66 F.3d 1226 (D.C.Cir. 1995). It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) (*per curiam*); *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 934, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). If the plaintiff fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport,* 166 F.3d at 367; *see, e.g., National Pharm. Alliance v. Henney,* 47 F.Supp.2d 37, 41 (D.D.C.1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their motion."). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial re-

view." *American Bankers Ass'n v. National Credit Union Admin.,* 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting *Holiday Tours,* 559 F.2d at 843).

■ In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *See National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 977 (D.C.Cir.1990) (citation omitted).

■ Finally, because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Mylan Pharms., Inc. v. Thompson,* 139 F.Supp.2d 1, 2001 WL 273073, *13 (D.D.C. March 13, 2001) (Urbina, J.); *Moore v. Summers,* 113 F.Supp.2d 5, 17 (D.D.C.2000). Although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. *See Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982). As the Supreme Court has said, "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## B. Injunctive–Relief Analysis

In this case, the court concludes that the plaintiff makes a strong showing on all four factors that the court must consider in the injunctive-relief analysis. In short, the plaintiff has shown that it has a good likelihood of success on the merits of the case, it would suffer irreparable harm if an injunction is not issued, the balance of the equities favors the plaintiff and issuance of a temporary restraining order would serve the public interest.

### 1. The Plaintiff Has a Strong Likelihood of Success on the Merits[3]

The plaintiff makes three main arguments in support of its contention that it would be likely to succeed on the merits in this case: (1) the non-solicitation covenant is fully enforceable against the defendant; (2) Morgan Stanley's customer list and information is entitled to trade-secret protection under the District of Columbia Uniform Trade Secrets Act; and (3) the defendant's agreement to the issuance of injunctive relief pending a resolution at arbitration must be enforced. The court will examine each argument in turn.

#### a. The Defendant's Non–Solicitation Covenant Is Fully Enforceable

■ Citing a spate of case law to support its position, the plaintiff contends that its non-solicitation agreement with the defendant is fully enforceable. *See, e.g., Morgan Stanley v. Weiss and Sandoe,* Dkt. No. 01–0816(RCL) (D.D.C. April 16, 2001); *Merrill Lynch v. Schultz,* Dkt. No. 01–0402(TFH) (D.D.C. Feb. 26, 2001). For example, the Agreement calls for a one-year covenant not to compete, unless the defendant works more than 100 miles away from Washington, D.C. *See* Compl., Ex. A. Pointing out that the Agreement contains only modest restrictions, the plaintiff argues that the agreement is fully enforceable under District of Columbia law.

The court agrees. There is nothing in the two-page Agreement that smacks of an unconscionable contract provision. And the defendant has raised no defenses of fraud or duress, for instance, in the making of the contract. Rather, the court views the agreement as a fair-minded contract that Morgan Stanley designed to prevent potentially harmful interference with its crucial client base. Chief Judge Norma Holloway Johnson of this court upheld a similar covenant against the former employee of the stock brokerage firm in *Citicorp Investment Services v. Mason:* "Plaintiff has also shown likelihood of success on the merits in that defendant may have breached the terms of the *Registered Principal Agreement.* Case law supports the issuance of injunctive relief in situations such as the present one, and plaintiff has cited numerous cases to this effect...." Dkt. No. 96–0353(NHJ) at ___ (D.D.C.1996) (emphasis in original).

The defendant argues that the Agreement is enforceable because the company never "discussed with me that Morgan Stanley was going to require me to sign a training contract or that Morgan Stanley interpreted that contract as abandoning my right to talk to my friends and family if I ever chose to leave Morgan Stanley." *See* Rothe Decl. at 2. This statement evades by exaggeration the clear import of the agreement as written. The agreement in no way forces the defendant to sever all ties with his friends and family.[4] In addition, the agreement does not prevent the defendant's former Morgan Stanley clients who wish to continue working with the defendant from *contacting him* and choosing to move their accounts to Oppenheimer. The reasonable, limited Agreement is meant to ensure only that the defendant himself does not reach out to his former

---

3. The first component of the likelihood of success on the merits prong usually examines whether the plaintiff has standing in a given case. *See, e.g., Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Because the defendant does not raise this issue, the court will assume arguendo that the plaintiff's standing in this case.

4. In fact, the Order accompanying this Memorandum Opinion makes an exception for the defendant's family members.

clients. Nothing prevents them from reaching out to him. Indeed, Morgan Stanley is forwarding the defendant's incoming calls to his new number at Oppenheimer. Thus, the Agreement in no way prevents the defendant's former clients from transferring their accounts to Oppenheimer.

Moreover, the Agreement does not prevent the defendant from working for his new employer and from competing with Morgan Stanley for the patronage of the public at large. Rather, the plaintiff seeks only to block the defendant from "diverting" Morgan Stanley customers, a condition to which he specifically agreed. The court determines that the plaintiff is likely to prevail on its claim that these conditions of the Agreement are eminently reasonable.

Next, the defendant seems to imply that Morgan Stanley somehow coerced him into signing the Agreement. The defendant, however, presents no evidence in support of this proposition. Nothing indicates that the defendant was forced to execute the Agreement. Aside from the defendant's flimsy statement that he was asked to sign the Agreement very quickly after becoming a financial advisor, the defendant presents no evidence of undue influence or any other problem that would render the contract invalid.

For his part, the defendant makes an adroit attempt to frame the likelihood-of-success-on-the-merits test as hinging on whether the plaintiff can demonstrate "that it will success on the merits in the NASD arbitration." *See* Opp'n at 5. Contending that "Morgan Stanley strangely relies on a series of decisions by courts at the temporary restraining order and preliminary injunction stage," the defendant states that the plaintiff "cites no arbitration decisions in its favor." *Id.* The defendant then indicates that the plaintiff took

this approach because it knows that it has "almost no likelihood of success on the merits." *See id.*

█ Candidly, the court discerns that the defendant framed the test for likelihood of success on the merits in this manner because *the defendant itself* is hard-pressed to establish on this record that it is likely to succeed on the merits. In short, the defendant intentionally creates a test that it thinks would allow it to win. The issue for this court, however, is not to predict what the NASD will do at the arbitration hearing. Rather, the issue for this court is to decide whether the plaintiff has sufficiently met its burden of showing potential actions by the defendant that would violate the terms of the Agreement, thereby justifying the granting of the temporary restraining order to prevent any irreparable harm to the plaintiff *in the interim period until* the NASD arbitration hearing can occur. Based on the two main allegations against the defendant—that he has already begun soliciting former clients and that he removed at least one file from Morgan Stanley—the plaintiff has demonstrated a likelihood of success on the merits in that it has already shown that the defendant's alleged actions would violate the terms of the Agreement. The issue before the court concerns whether the defendant has violated the terms of his contract, not whether the plaintiff would prevail at an NASD arbitration hearing.

In what borders on a desperate effort to justify the conduct at issue, the defendant maintains that "what Morgan Stanley is complaining of here is nothing more than standard industry practice." Opp'n at 9. On the face of the present record, the defendant appears to advance the notion that standard industry practice in the financial-services industry involves routinely breaching contracts. Hopefully, this is not the case. Instead, the court expects that

when an employee signs a contract agreeing not to solicit his former clients for one year upon leaving his old firm, the employee will honor it.

### b. The Plaintiff's Customer List and Information is Entitled to Trade–Secret Protection under the District of Columbia Uniform Trade Secrets Act

■ The plaintiff's second principal theory for why it would be successful on the merits is that the District of Columbia's Uniform Trade Secrets Act, D.C.Code §§ 48–501 to 509, expressly provides for injunctive relief to protect an employer's trade secrets. *See* D.C.Code § 48–502. The D.C.Code defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of reasonable efforts to maintain its secrecy.

D.C.Code § 48–501(4)(A), (B). Pointing to this provision, the plaintiff argues that many courts have granted customer lists trade-secret status under other states' Uniform Trade Secrets acts and under the corresponding Restatement standards. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman,* 1996 WL 707107, *2 (D.Kan.1996); *IDS Financial Servs., Inc. v. Smithson,* 843 F.Supp. 415, 418 (N.D.Ill.1994). To the extent that this district has not had occasion to address the issue, this court now holds that the customer lists of a financial-services firm deserve trade-secret status under D.C.Code § 48–501.

In its brief, the defendant never responds to this argument by the plaintiff. The court determines that the plaintiff has a substantial chance of succeeding on this line of reasoning.

### c. The Agreement Contains an Injunctive–Relief Provision Pending a Resolution of Arbitration

Lastly, the plaintiff submits that the defendant expressly agreed to the entry of a temporary restraining order and a preliminary injunction to preserve the status quo pending the outcome of any arbitration hearing that may be initiated. *See* Pl.'s Mem. at 9; Compl., Ex. A., ¶ 3. The plaintiff states that this is a specifically enforceable term of the Agreement. Once again, the defendant offers no response.

■ In conclusion, at this initial stage, the court determines that the plaintiff has a strong likelihood of success on the merits of all three of their principal arguments. When considering a party's motion for a preliminary injunction, the court must pay special attention to the first prong of the injunctive-relief test, for it is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) (*per curiam* ); *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Doran,* 422 U.S. at 934, 95 S.Ct. 2561.

### 2. The Plaintiff Will Suffer Irreparable Harm If the TRO Is Not Granted

The plaintiff alleges that the defendant misappropriated, or is about to misappropriate, Morgan Stanley's trade-secret information and has violated the express provisions of his Morgan Stanley employment agreement. *See* Pl.'s TRO Mot at 1. Thus, the plaintiff claims that it will be

irreparably harmed "unless Defendant is enjoined from converting Morgan Stanley's property to his own use and from soliciting Morgan Stanley's clients...." *See id.* at 2.

In response, the defendant maintains that the supposed irreparable harm that the plaintiff seeks to protect here cannot constitute irreparable harm since "D.C. Circuit law clearly holds that economic loss alone does not constitute irreparable harm." *See* Opp'n at 10 (citing *Barton v. District of Columbia,* 131 F.Supp.2d 236, 247 (D.D.C.2001) (Urbina, J.)). The defendant also contends that Morgan Stanley's "purported injury" can be adequately addressed by compensatory damages, which is exactly what Morgan Stanley seeks at an arbitration proceeding.

■ In pressing its argument, the plaintiff lists three reasons why it would suffer irreparable damage if the court did not grant the motion for the temporary restraining order. First, Morgan Stanley suggests that it will suffer incalculable damages without injunctive relief. The plaintiff points out that the defendant serviced hundreds of Morgan Stanley accounts, representing in excess of $10 million in assets under Morgan Stanley management and generating more than $250,000 in Morgan Stanley commissions during the past 12 months. "It is impossible to determine at this time the number of Morgan Stanley clients who will be 'pirated away' by Defendant. Nor is it possible to determine with any degree of certainty the commissions each of these Morgan Stanley clients will generate not only this year, but *5, 10 or 20 years in the future.*" *See* Pl.'s Mem. at 12 (emphasis in original). In support of this assertion, the plaintiff presents the affidavit by Mr. Tilahun, who declares that the day after the defendant resigned from Morgan Stanley, he began soliciting his

former clients by sending at least one of them a package of materials designed to lure the client away from Morgan Stanley. *See* Pl.'s Mem., Ex. A., Tilahun Aff. at 3.

Second, Morgan Stanley suggests that it will suffer irreparable harm from the loss of the confidentiality of customer information and the concomitant loss of customer trust and goodwill. As the plaintiff says, "Morgan Stanley clients expect their financial information, their market transactions, and their investment assets to be known only to themselves, Morgan Stanley, and Morgan Stanley employees." *See* Pl.'s Mem. at 12. In this case, the defendant allegedly removed all the original files of a significant Morgan Stanley client, who maintained accounts with more than $5 million of assets. *See id.,* Ex. A at 3. In addition, the plaintiff urges that if the defendant is allowed to continue this conduct, each client's sensitive financial information would be stripped of its confidentiality.

The court deems both of these arguments persuasive. In particular, the court shares the view of Mr. Tilahun, who states that "Morgan Stanley's customer list is the lifeblood of its business ..." and that the company spends millions of dollars each year to build and retain its clients. The plaintiff and other financial-services firms do not make cars or sell food. Their business involves collecting extremely private and sensitive data about their clients and then providing them with the best possible financial advice and services based on that information. Although a major reason that firms have employees sign non-compete agreements is to protect their business interests, another objective is surely to protect their clients' privacy. Specifically, the Agreement seeks to keep the names, personal contact information, and perhaps most importantly, the personal fi-

nancial information of the plaintiff's clients confidential by ensuring that if an employee goes from Morgan Stanley to another company, the other company will not suddenly have access to the clients' personal financial data without the clients' permission. If clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill.

Finally, the plaintiff maintains that it needs immediate injunctive relief to protect the stability of its Washington D.C. office, where the defendant worked. The plaintiff states that an injunction will help discourage competitor firms, such as Oppenheimer, "from conspiring with and inducing Morgan Stanley's employees to breach their contractual commitments and to divert Morgan Stanley's trade secret client lists to a competitor." *See* Pl.'s Mem. at 13.

The court does not credit this argument with the same strength as the plaintiff's other arguments. The plaintiff has not persuasively demonstrated that its entire Washington office would be thrown into turmoil by the defendant's actions. Nevertheless, the plaintiff's other arguments are compelling. The plaintiff has persuaded the court that it would likely suffer irreparable harm in the loss of its customers and by the possibly permanently damaged relationships with its customers. *See Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir.1985).

### 3. The Balance of the Equities

Like the previous two factors, the balance-of-harms prong strongly militates in favor of granting injunctive relief.

For its part, the plaintiff asserts that an injunction would protect its goodwill, business reputation, methods of business oper-

ation, and contract rights. In contrast, the plaintiff argues, the defendant has no equity since he intentionally breached his contractual commitments and misappropriated the plaintiff's trade-secret property.

The defendant counters that "the injunction Morgan Stanley seeks would substantially injure Rothe's career." *See* Opp'n at 12–13. "Simply put, Rothe has a right to earn a living, and Morgan Stanley's assertion of some entitlement to the clients Rothe developed through his own family and friends would be an unwarranted intrusion on the right." *See id.* at 13.

In this regard, the defendant's position falters in the face of the governing realities. The Agreement calls only for a modest one-year restriction. Nothing in the record suggests that the defendant's "right to earn a living" is substantially put at risk. Indeed, the plaintiff emphasizes that it "does not seek to prevent Defendant from earning his living as a stockbroker, even though he will be doing so with a rival area company." *See* Pl.'s Mem. at 7. Moreover, the defendant's former clients are still allowed to contact him and to continue their business relationship; he just cannot contact or solicit them. As the plaintiff acknowledges, the defendant is free to develop new clients at Oppenheimer from the same client pool that the plaintiff taps into for business. Furthermore, the court's Order dated May 18, 2001 specifically makes an exception that allows the defendant to contact and keep the files of his family members.[5]

Finally, the defendant says he "had no obligation to remain at Morgan Stanley.... Morgan Stanley has absolutely no legitimate interest in prohibiting me from contacting my clients, the vast majority of whose accounts I developed through my

---

5. In terms of the defendant's friends whom he says he brought to Morgan Stanley as clients, the arbitration hearing will presumably address this matter.

friends and family." Rothe Decl. at 4. This statement simply does not wash. The court agrees with the defendant that he had no obligation to remain at Morgan Stanley. But that is not the question in this case. Rather, the defendant is incorrect that Morgan Stanley has no legitimate interest in prohibiting him from contacting his former clients at Morgan Stanley. In fact, the terms of the agreement that the defendant himself signed state otherwise. Indeed, as explained above, the plaintiff has several very good reasons for wanting to prevent the defendant from contacting his clients. The court holds that the balance of the equities favors the plaintiff.

### 4. Granting the Injunction Serves the Public Interest

 The court agrees with the plaintiff that by issuing an injunction, the court serves the public interest in protecting trade-secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act. As another district court held: "[t]he public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records." *See IDS Life Ins. Co. v. Sunamerica, Inc.*, 958 F.Supp. 1258, 1282 (N.D.Ill.1997). "Consequently, the public's interest has been disserved by defendants' actions. The public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior." *See id.*

The defendant replies that "it is the public that will in reality be restrained." *See* Opp'n 14. Contending that the plaintiff cannot assert an interest in preventing the customers at issue from deciding where to invest their assets, the defendant argues that *"it is the customer's decision alone as to where to invest his or her money." See id.* (emphasis in original). Accordingly, the defendant argues that by issuing an injunction, the court would harm and inconvenience the customers as they wait for an end to this dispute. The defendant also cites the rules of the NASD and the New York Stock Exchange, which state that public customers have a right to decide for themselves with whom they will do securities business. *See id.*

In this case, however, the plaintiff is not eliminating or even impairing the customers' decision-making ability. Clearly, Morgan Stanley is not seeking to tell the customers that they must do business with Morgan Stanley. Rather, it appears that Morgan Stanley endeavors to enforce the Agreement made with its former employee to ensure that he does not reach out to these customers to lure their business away from Morgan Stanley. An injunction will in no way intrude on customer-initiated contact.

Moreover, the defendant selectively cites the language of the NASD news release dated May 7, 2001. *See* Opp'n, Ex. 2. While the defendant notes that the NASD rule interpretation prohibits "any member firm from taking any action that interferes with a customer's right to transfer his or her account," unfortunately the defendant omits the language stating that "The interpretation does not restrict employment contracts that may prevent brokers from soliciting a previous employer's customers. It also does not prevent a firm from seeking a court order when a former employee violates an employment contract." *See id.*

A final factor tipping the public-interest scales to the plaintiff's side is the court's desire to see the terms of a reasonable contract enforced.

 In sum, the plaintiff would like a temporary restraining order pending an expedited hearing on the merits before a panel of arbitrators in accordance with Rule 10335(g) of the NASD Code of Arbi-

tration Procedure. The court concludes that the plaintiff has met its burden of showing that it deserves injunctive relief. The plaintiff has made a compelling showing with regard to all four factors. It has demonstrated that it has a strong likelihood of success on the merits, that it would suffer irreparable harm if the court did not issue an injunction, that the balance of the harms favors the plaintiff, and that the court would further the public interest by granting injunctive relief. Accordingly, the court grants the plaintiff's motion for a temporary restraining order.

## C. The Defendant's Alternative Arguments

In addition to opposing the issuance of an injunction on the ground that the plaintiff does not pass the four-factor test, the defendant also raises two other arguments. First, it insists that an NASD arbitration hearing is the appropriate forum in which to resolve this dispute. As the court has explained above, however, while an arbitration hearing will be the appropriate forum in which to mediate the details of the dispute, this court is the appropriate forum to determine whether the defendant's alleged breach of his contract justifies granting the plaintiff a temporary restraining order. The defendant's argument, therefore, fails.

Second, the defendant charges that Morgan Stanley itself has "unclean hands" since it allegedly engaged in similar conduct in trying to lure away clients when it hired new employees from other firms. *See* Opp'n at 19. "Morgan Stanley's supposedly indignant attitude toward Rothe's alleged conduct is all the more absurd given that it had directed Rothe to assist in the preparation of solicitation packets

for other brokers when Morgan Stanley recruited them from competitors." *See id.;* Ex. 5 (*Doss v. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dean Witter Reynolds, Inc.,* NASD No. 95–02079 (1995)).

Once again, the plaintiff makes the prevailing point. In its Reply brief, it explains that Mr. Rothe "identifies not a single fact to demonstrate that Morgan Stanley has undertaken any wrongful conduct with regard to Mr. Rothe's employment at Morgan Stanley." *See* Reply at 4. Indeed, the Supreme Court has held that a party asserting an unclean-hands defense must show an "immediate and necessary relation" between the instant case and the alleged misconduct. *See Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). In short, since the defendant has not shown wrongdoing that has any "relation to anything involved in the suit" at bar, this argument also fails. *See id.*

## D. A Return to the Status Quo

In sum, the plaintiff seeks to return to the status quo, which would require the defendant to return all confidential data it has allegedly wrongfully diverted from the plaintiff. This would also require the defendant to be enjoined from further solicitation of the plaintiff's customers. The court agrees, and grants the plaintiff's motion.[6]

## IV. CONCLUSION

For all these reasons, the court grants the plaintiffs' motion for a temporary restraining order. An order directing the parties in a fashion consistent with this

---

6. For a detailed listing of the court's instructions, see the Order accompanying this Memorandum Opinion dated May 18, 2001.

Memorandum Opinion was separately issued on May 18, 2001.