**CITY OF TEMPE, ARIZONA, et al., Plaintiffs,**

v.

**FEDERAL AVIATION ADMINISTRATION, et al., Defendants.**

**No. CIV.A. 02–2029(EGS).**

United States District Court, District of Columbia.

Jan. 14, 2003.

Jeffrey L. Karlin, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Barbara E. Lichman, pro hac vice, Berne C. Hart, pro hac vice, Jacqueline E. Serrao, Chevalier, Allen & Lichman, LLP, Irvine, CA, for plaintiff.

## MEMORANDUM OPINION

BATES, District Judge.

The City of Tempe, Arizona ("Tempe") and Joseph Lewis ("Lewis") (collectively, "plaintiffs") apply for a preliminary injunction to halt further progress on a development project at Phoenix Sky Harbor International Airport ("PHX") in Phoenix, Arizona. Plaintiffs assert that the Federal Aviation Administration ("FAA") improperly authorized grants for the project, and that the City of Phoenix ("Phoenix") improperly proceeded with construction, without performing the required conformity determination under the Clean Air Act and its implementing regulations. For the reasons stated below, plaintiffs' application is denied.[1]

## I. BACKGROUND

### A. Regulatory Structure

The Clean Air Act, enacted in 1970 and amended in 1977 and 1990, establishes a joint state and federal program to control air pollution. Under 42 U.S.C. § 7409, the Environmental Protection Agency ("EPA") must establish primary and secondary national ambient air quality standards ("NAAQS") for certain pollutants for the protection of public health and welfare. See 40 C.F.R. Part. 50. As contemplated in 42 U.S.C. § 7410, the measures necessary to attain the NAAQS will be applied to individual sources through an implementation plan prepared by each state, subject to EPA review and approval, for each "air quality control region" within the state. A state implementation plan must specify emission limitations and other measures necessary to attain and maintain the NAAQS for each pollutant. 42 U.S.C. § 7410(a)(2)(A)-(K).

42 U.S.C. § 7506(c)(1), as amended in 1990, the so-called "Conformity Provision" that is at issue here, provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity

---

1. Although this case is assigned to Judge Sullivan of this Court, the application for a preliminary injunction has been referred to the undersigned as motions judge. Because the parties required a decision on the application prior to January 6, 2003, the beginning date for construction on Phase II of the development project, the Court issued an order denying the application on January 3, 2003. This opinion explains that order.

which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." The statute specifies that an activity is in "conformity" if the anticipated emissions will not frustrate a state implementation plan's general purposes (i.e., eliminating violations and realizing expeditious attainment of NAAQS) and the action will not (1) cause or contribute to a new violation, (2) exacerbate an existing violation, or (3) delay attainment of the standard or a required interim reduction or other milestone. *Id.* § 7506(c)(1)(A)-(B). Congress directed the EPA to promulgate criteria and procedures for assessing the conformity of federal actions with state implementation plans. *Id.* § 7506(c)(4)(A). Those rules were established in 1993, and are codified at 40 C.F.R. Part 93, Subpart B, §§ 93.150–160.

In 40 C.F.R. § 93.153(c)(2), the EPA exempted from the Subpart B requirements certain federal actions that "would result in no emissions increase or an increase ... that is clearly de minimis." Specifically identified as exempt are "[r]outine maintenance and repair activities, including repair and maintenance of administrative sites, roads, trails, and facilities." 40 C.F. R. § 93.153(c)(2)(iv). EPA's rule also sets threshold emissions levels for specific pollutants and provides that any action for which the total of direct and indirect emissions is below the applicable threshold level is exempt from the requirement of a conformity determination under Subpart B. 40 C.F.R. § 93.153(c)(1).

## B.  The Center Runway Project

PHX is a major passenger and cargo facility for the southwestern United States and among the busiest airports in the country. Declaration of Dave Krietor ¶¶ 3–4. In 1999, PHX staff began planning a construction project involving the 10,300 foot-long Center Runway, one of PHX's three runways. *Id.* ¶ 9. PHX staff had determined that the Center Runway, which was built in the 1970s and is composed of bituminous asphaltic pavement, had become degraded over the years and required reconstruction by 2002. *Id.* ¶¶ 6, 9; Declaration of Kevin Flynn ¶ 19; Administrative Record ("AR") No. 29 (section entitled "Program Narrative").

Working with the FAA, PHX staff developed a proposal for the Center Runway Project involving: (i) milling the existing bituminous asphalt pavement on the Center Runway and overlaying it with 18–inch thick Portland Concrete Cement ("PCC"); (ii) select milling and overlaying of portions of two taxiways; (iii) construction of tapers along existing taxiways; (iv) removal of abandoned utility lines; (v) modification of existing taxiway/runway lighting systems; (vi) alteration of existing taxiway and runway signage; (vii) temporary construction access; and (viii) onsite grading and localized drainage improvements. Krietor Decl. ¶ 14.[2] This development was to take place in several phases. Phase I, which began on July 8, 2002, and has recently been completed, involved drainage, electrical and earthwork, mill and asphalt replacement for two taxiways, and preparation for concrete and asphalt work. *Id.* The remainder of the Project was scheduled to continue as follows:

> *Phase II:* Phase II begins January 6, 2003 and is 50 days in duration. During this phase, the Center Runway will be completely shut down seven days a week for 24 hours per day for milling of the existing asphalt surface and application

---

2.  PHX staff originally envisioned a more substantial project. After the events of September 11, 2001, however, the construction budget was reduced from $120 million to $66 million. Krietor Decl. ¶ 14.

of the PCC overlay. In addition, some electrical and drainage work will be accomplished during this phase.

*Phase III:* This phase will begin on approximately February 26, 2003 for 40 days. During this phase the Center Runway will be reopened to a reduced length of 7,500 feet, with 1,000 foot safety areas on each end. Completion of the concrete paving will occur as well as electrical and drainage work. At the end of this phase, the Center Runway will be reopened to its full length of 10,300 feet.

*Phase IV:* This phase will commence on approximately April 7, 2003 and is 150 days in duration. During this phase, the Project will be completed (e.g., modification of existing taxiway/runway lighting systems, alteration of existing taxiway and runway signage, etc.).

Krietor Decl. ¶ 15.

In early 2001, Phoenix applied to the FAA for funding for the Center Runway Project under the FAA's Airport Improvement Program. *See* AR No. 29. Thereafter, the FAA approved four grants totaling over $40 million. *See* Flynn Decl. ¶ 10. With respect to each grant, the FAA indicated in its project evaluation report that no air quality conformity determination was necessary because the "proposed project is exempted in accordance with 40 CFR 93, Subpart B, Section 93.153, Paragraph (c)(2)." AR Nos. 26 (dated April 18, 2001), 40 (dated September 18, 2001), 51 (dated July 30, 2002), and 57 (dated September 24, 2002).

On October 16, 2002, Tempe, which is located two miles from PHX, and Lewis, who resides 2.5 miles from PHX, filed the complaint in this case against the FAA, Phoenix, and certain of their officials.[3] Plaintiffs charge that defendants failed to comply with the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, and specifically the Conformity Provision, 42 U.S.C. § 7506, because the FAA funded the Center Runway Project, and Phoenix moved forward with construction, without performing a conformity determination. Complaint ¶¶ 13, 15. According to plaintiffs, such a determination is required under the EPA regulations at 40 C.F.R. Part 93, Subpart B, because the Center Runway Project will cause significant emissions of particulate matter ("PM10"). These emissions, plaintiffs claim, will have adverse health consequences for Tempe's citizens (including Lewis) and its city officials and employees, and will result in damage to Tempe's buildings. Compl. ¶¶ 3–4. Furthermore, plaintiffs assert, because "the physical expansion of existing Tempe industries, and the physical development of future industries, will produce PM10s, [the Center Runway] project will have ... significant negative economic ramifications for Tempe as it will curtail such economic development due to the region already having reached or exceeded threshold levels for PM10 emissions." *Id.* ¶ 3.

Plaintiffs' complaint contains two principal counts: (i) a claim against the FAA under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), and the Conformity Provision, 42 U.S.C. § 7506, based on the FAA's alleged failure to conduct a conformity determination; and (ii) a claim against Phoenix under Arizona Rev. Code § 28–2411, *et seq.*, for failure to comply with federal law requiring a conformity

---

**3.** The officials being sued are: Marion C. Blakey, Administrator, FAA; William C. Wythcombe, Regional Administrator, FAA Western Pacific Region; Mayor Skip Rimsza of Phoenix; and Does 1 through 20. For purposes of this opinion, the FAA defendants are referred to collectively as "FAA," and the Phoenix defendants are referred to collectively as "Phoenix."

determination. Plaintiffs seek declaratory relief against the FAA under 28 U.S.C. § 2201(a), an order compelling performance by the FAA under 28 U.S.C. § 1361, a writ of mandamus against Phoenix under Arizona Rev. Statute § 12–2021, and preliminary and permanent injunctive relief against all defendants.

On December 16, 2002, three weeks before the scheduled commencement of Phase II of the Center Runway Project, plaintiffs applied for a preliminary injunction to enjoin the FAA from funding the Project, and to stop Phoenix from taking action to further the Project, pending full compliance with 42 U.S.C. § 7506 and the related EPA regulations. The FAA and Phoenix filed separate oppositions to plaintiffs' application. Phoenix has also moved to dismiss the complaint against it. A hearing on the motion for a preliminary injunction was held on January 3, 2003.

## II. ANALYSIS

### A. Standard for Preliminary Injunction

In order to prevail on their application for a preliminary injunction, plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977). In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are par-

ticularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.*

It is particularly important for plaintiffs to demonstrate a substantial likelihood of success on the merits. *Morgan Stanley DW Inc. v. Rothe*, 150 F.Supp.2d 67, 73 (D.D.C.2001). Where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Brotherhood of Teamsters, AFL–CIO*, 166 F.3d 356, 367 (D.C.Cir.1999).

Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Morgan Stanley DW*, 150 F.Supp.2d at 73. "As the Supreme Court has said, '[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

### B. Likelihood of Success

#### 1. Claims against FAA

■ Under the APA, the FAA's actions in applying the Conformity Provision of the Clean Air Act may only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see City of Olmsted Falls v. FAA*, 292 F.3d 261, 269 (D.C.Cir.2002). The scope of review under the arbitrary and capricious standard is narrow and a "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct.

2856, 77 L.Ed.2d 443 (1983).[4]

■ Plaintiffs allege that the FAA erred by declining to conduct a conformity determination with respect to the various grant approvals. Governing EPA regulations, however, provide that no conformity determination is required for federal actions that "would result in no emissions increase or an increase ... that is clearly de minimis." 40 C.F.R. § 93.153(c)(2). In this context, the regulations specifically exempt "[r]outine maintenance and repair activities, including repair and maintenance of administrative sites, roads, trails, and facilities." *Id.* § 93.153(c)(2)(iv).

The administrative record here reflects that the FAA exempted each proposed project "in accordance with 40 C.F.R. 93, Subpart B, Section 93.153, Paragraph (c)(2)." AR Nos. 26, 40, 51, and 57. Kevin Flynn, the FAA supervisor who reviewed the grant proposals for the Center Runway Project, explains that, in determining whether the Center Runway Project qualified for exemption, he specifically consulted a May 1995 internal guidance memo-

randum for the FAA's Western–Pacific Region concerning the application of 40 C.F.R. § 93.153(c)(2). Flynn Decl. ¶¶ 6–8, 10. This guidance document clarified that, under 40 C.F.R. § 93.153(c)(2), grant approval does not require a conformity determination where the proposed development involves "[r]unway, taxiway, apron, or loading ramp repair work including reconstruction, resurfacing, marking, grooving, fillets, and jet blast facilities [93.153(c)(2)(iv)] [93.153(c)(2)(x)]." Flynn Decl. ¶¶ 7–8; AR No. 20 at Attachment 2.

The Court is not persuaded at this time that the FAA's action was arbitrary or capricious or otherwise not in accordance with law. The Center Runway Project's focus on runway reconstruction and resurfacing appears to fit squarely within the exemption under 40 C.F.R. § 93.153(c)(2) as elaborated in the FAA's 1995 internal guidance document. This is not a case involving significant new construction. Moreover, the fact that the Center Runway Project will be costly and potentially disruptive does not necessarily disqualify it from an exemption.[5] In addition, the 1995

**4.** Plaintiffs contend that the framework for analysis under *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), not the "arbitrary and capricious" standard under the APA, should govern this Court's review, because the Conformity Provision contains a clear mandate. Plaintiffs argue, moreover, that the court owes no deference to the FAA's interpretation because the Conformity Provision is directed to all agencies. In *City of Olmsted Falls,* 292 F.3d at 269–70, however, the D.C. Circuit expressly held that the "arbitrary and capricious" standard of the APA governs review of the FAA's application of the Conformity Provision.

**5.** In his declaration, Mr. Flynn explains that prior to approving the third and fourth grants for the Center Runway Project, he reviewed an environmental analysis prepared by a consultant to Phoenix, the so-called "Harding ESE Report." Flynn Decl. ¶¶ 12–14. The Report indicated that the total direct and indirect emissions from the Center Runway Pro-

ject would be below 70 tons per year—the level at which the requirement for a conformity determination is triggered under 40 C.F.R. § 93.153(b). *See* AR No. 91 at Table ES–2; Declaration of Robert A. Zimmer ¶¶ 8–9; Flynn Decl. ¶ 14. Thus, according to Mr. Flynn, the "report ... validated the FAA's determination that the Center Runway Project was exempt under 40 C.F.R. § 93.153(c)." Flynn Decl. ¶ 14. Although the FAA does not appear to be claiming that the Center Runway Project was exempted because the emissions levels fell below the threshold specified in § 93.153(b), and the administrative record does not reflect that an exemption was granted on that basis, the Court agrees with the FAA that the reasonableness of its conclusion that a "de minimis" exemption under § 93.153(c)(2) applies is bolstered by the fact that the evidence before the FAA (the Harding ESE Report) indicated that only minimal emissions would result from the Center Runway Project.

guidance document itself does not appear to be problematic. The EPA regulations—which apply to all federal agencies—provide an exemption for federal action involving "[r]outine maintenance and repair activities." *See* 40 C.F.R. § 93.153(c)(2). Given that runways comprise a major feature of the infrastructure in the aviation sphere, it was not unreasonable for the FAA to conclude in its internal guidance that reconstruction and resurfacing constitute "[r]outine maintenance and repair activities" within the meaning of 40 C.F.R. § 93.153(c)(2).

At the hearing in this matter, counsel for plaintiffs asserted that the 1995 internal guidance memorandum relied upon by Mr. Flynn was superseded by an FAA directive promulgated in 1999—FAA Order 1050.1D, Change 4, Attachment 2 ("Attachment 2"). That document states, in relevant part:

> Certain Federal actions are exempt from the requirements of the General Conformity Rule because they result in no emissions or emissions are clearly below the rule's applicability emissions threshold levels. These include, but are not limited to: . . . (2) Routine maintenance and repair activities.

Attachment 2 at 5. According to plaintiffs, it was erroneous for Mr. Flynn to rely upon internal guidance from 1995 that had been superseded by Attachment 2 in 1999.

Plaintiffs are not likely to prevail on this argument. Plaintiffs have not at this point identified any language in Attachment 2 indicating an intention by the FAA to supersede or withdraw earlier specific guidance. Nor, for that matter, does the 1995 internal guidance memorandum appear to be inconsistent with Attachment 2, which is focused largely upon requirements under the National Environmental Policy Act, not the Clean Air Act, and contains only a generalized discussion of how the exemptions identified in § 93.153(c)(2) apply in the aviation context. Moreover, Attachment 2 specifies that the exemptions are "not limited" to those specifically enumerated.[6] Accordingly, for all of the above reasons, plaintiffs have not established that they are substantially likely to succeed on their claims against the FAA.

**2. Claims Against Phoenix**

■ Plaintiffs' claims against Phoenix are no more likely to succeed. The clear import of plaintiffs' claims, as alleged in their complaint and as described (albeit briefly) in their application for a preliminary injunction, is that Phoenix violated Arizona law by failing to comply with federal law requiring a conformity determination. Specifically, plaintiffs allege that Ariz. Rev.Code § 28–8411 *et seq.* requires that Phoenix, in expending grant funds for airport purposes, comply with the " 'terms and conditions that are imposed by the U.S. in making the grant.' " Compl. ¶ 38 (quoting Ariz. Rev.Code § 28–8413(c)).

---

**6.** Plaintiffs also assert that the 1995 internal guidance document is flawed because it deviates from an earlier FAA document, FAA Order 5050.4A. That document states that no environmental review is required for "(1) Runway, taxiway, apron or loading ramp construction or repair work including extension, strengthening, reconstruction, resurfacing, marking, grooving, fillets and jet blast facilities . . . except where such action will create environmental impacts off airport property." FAA Order 5050.4A ¶ 23(a)(2). Plaintiffs contend that, although the 1995 internal guidance tracks language from FAA Order 5050.4A, the guidance omits the key language "except where such action will create environmental impacts off property." But FAA Order 5050.4A is about the National Environmental Policy Act, not the Clean Air Act, and in fact was promulgated prior to the 1990 Clean Air Amendments that expanded the conformity requirement and prior to the 1993 EPA regulations at 40 C.F.R. Part 93. FAA Order 5050.4A is thus of no relevance here.

The terms and conditions imposed by the federal government, plaintiffs assert, require that Phoenix "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the ... use of Federal funds for this project." *See id.* ¶ 39. Here, plaintiffs allege, "State Defendants ... have failed and refused to comply with Arizona Rev.Code § 28–8411, *et seq.*, by among other things, failing and refusing to comply with applicable Federal laws, including, but not limited to, Clean Air Act § 7506, requiring performance of a full Conformity Determination for the Project, even though they knew, or had reason to know, that the Project would create emissions in excess of 70 t/y, the de minimis threshold." *Id.* ¶ 40.

As Phoenix points out in its opposition brief, however, it is not the airport operator (Phoenix) which has an obligation under federal law to perform a conformity determination; rather, it is the federal agency (the FAA). Accordingly, Phoenix argues, it could not have violated federal law, and thus Arizona law, by failing to make a conformity determination.[7] Moreover, Phoenix contends, it cannot be compelled through an injunction or writ of mandamus to exercise an obligation which it does not have.

Plaintiffs, apparently recognizing the strength of Phoenix's argument, have—in their reply brief—significantly changed the nature of their claim against Phoenix.

Although the precise contours of plaintiffs' new theory of relief are not entirely clear, plaintiffs appear to be claiming that Phoenix has breached Arizona law, not just because it has failed to perform a conformity evaluation, but also because it has violated the emissions limitations established in Arizona's state implementation plan by "push[ing] PM10 emissions above de minimis thresholds." Pls.' Reply at 9. In other words, plaintiff is alleging that the Center Runway Project does not, in fact, conform to Arizona's state implementation plan.

Plaintiffs' arguments are not persuasive. They have not identified any provision under federal law that requires Phoenix to perform a conformity determination, and thus Phoenix's alleged failure to do so cannot subject it to liability. Moreover, with respect to plaintiffs' argument that Phoenix has violated Arizona's state implementation plan, the Court is loathe to entertain a theory of relief that was not pled in plaintiffs' complaint and not discussed in plaintiffs' opening memorandum in support of its application for urgent relief. In any event, given that, as discussed below, the only evidence presently before the Court is that the emissions from the Center Runway Project are so low that a conformity determination is not even required, plaintiffs are not likely to succeed on a claim that the emissions from the Center Runway Project exceed permissible levels in the state implementation plan.[8]

7. In addition, Phoenix argues that it did commission a conformity analysis—the Harding ESE Report.

8. Phoenix asserts that plaintiffs' claims against it fail for additional reasons as well. Phoenix argues, for example, that this Court lacks personal jurisdiction over it under the District of Columbia's long-arm statute because Phoenix has no connection to the District, and specifically, that all of Phoenix's contacts in connection with applying for and

receiving grant funds were with the FAA's Western–Pacific Regional Headquarters in Los Angeles, California. Moreover, Phoenix asserts, even if it did have contacts with the FAA in the District of Columbia, those contacts would be insufficient to establish personal jurisdiction in light of the "government contacts exception" applicable in the District. *See Envtl. Research Int'l v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C.1976) (en banc) (noting the "long-standing and still vital

## C. Irreparable Harm

■ Plaintiffs have also failed to establish that they will be irreparably harmed if a preliminary injunction is not issued. As an initial matter, it is not clear that plaintiffs would suffer any irreparable injury as a result of the Center Runway Project, even if PM10 were emitted. The D.C. Circuit has questioned whether a city can bring a lawsuit on behalf of its citizens for violations of federal environmental laws. *See City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C.Cir.2002). Moreover, while Tempe alleges that it will be harmed as a city because economic development will be hindered by PM10 emissions from the Center Runway Project, Tempe has not provided any factual support for this assertion. Tempe has not identified any specific business development opportunity that will be foreclosed or delayed due to the Project, much less provided evidence of any imminent harm to economic development that necessitates immediate injunctive relief.[9] Likewise, Tempe has made no more than a blanket assertion that city buildings will be damaged as a result of PM10 emissions. Such speculative assertions of harm will not suffice to support preliminary injunctive relief. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). With respect to plaintiff Lewis, although it is certainly reasonable to presume that an individual residing near the source of PM10 emissions might suffer deleterious effects from those emissions, it is worth noting that plaintiffs have submitted no factual materials concerning Lewis in particular.

But, ultimately, even if plaintiffs could prove that excessive emissions from the Center Runway Project will affect them, plaintiffs have not established that the emissions are anything more than minimal. The Harding ESE Report, which was commissioned by Phoenix, concluded in October 2001 that PM10 emissions from the Project (as it was then envisioned) would be 7.8 tons in 2001 and 62 tons in 2002—less than the 70 annual tons of PM10 permitted by 40 C.F.R. § 93.154(b) in serious nonattainment areas before the requirement for a conformity determination is even triggered. *See* AR No. 91 at Table ES–2; Zimmer Decl. ¶¶ 8–9. Moreover, a Supplemental Harding ESE Report completed in August 2002 to account for the delayed timing and reduced scale of the Center Runway Project in the aftermath of September 11th, *see* supra note 2, concluded that PM10 emissions from the Project would be 34 tons in 2002 and 51 tons in 2003—even further below the threshold of 70 tons per year. *See* Zimmer Decl. ¶¶ 10–11 & Ex. B at Table 3.1. The Supplemental Harding ESE report also concluded that PM10 emissions from the Project would not be "regionally significant." *Id.* ¶ 12 & Ex. B at 3–2.[10]

doctrine that entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction"). Phoenix also argues that the claims against it are defective because plaintiffs did not comply with Arizona Rev. Stat. § 12–821.01(A), which requires that a plaintiff file a notice of claim within 180 days after a cause of action accrues. The Court need not reach any of these arguments, given the substantive weaknesses of plaintiffs' claims.

9. Defendants argue, additionally, that even if some future business sought federal approval for a project, the federal agency would evaluate the total direct and indirect emissions for that federal project alone. *See* 40 C.F.R. § 93.153(b). Accordingly, defendants contend, emissions from the Center Runway Project would not be considered by a federal agency in evaluating some future project in Tempe, and thus could not be a factor in impeding future economic development in Tempe.

10. A regionally significant action is one that generates 10 percent or more of the total

Plaintiffs, for their part, have introduced no evidence demonstrating that the Center Runway Project will actually cause emissions above 70 tons per year. In their initial moving papers, they cited to a report produced by Phoenix in December 1999, the "Stantec Report," which calculated that the emissions from all projects at Phoenix's airports would exceed 70 tons in 1999. *See* Declaration of Jacqueline Serrao, Ex. E. at vi. But the Stantec Report focused on years which are not at issue here (1996 through 2001), *see id.*, and, as plaintiffs' own expert, Robert G. Dulla, concludes, did not contain any analysis of the principal features of what eventually became the Center Runway Project. *See* Declaration of Robert G. Dulla (executed December 13, 2002) ¶ 3; *see also* Pls.' Mem. at 24 (Stantec Report "show[s] no consonance with the components of the Center Runway Project."). Indeed, at the hearing in this matter, counsel for plaintiffs conceded that the Stantec Report is of no relevance here.

Along with their reply brief in this case, plaintiffs did submit a second declaration from Mr. Dulla opining on alleged errors in the Harding ESE Report and its supplement. *See* Declaration of Robert G. Dulla (executed December 30, 2002) ("Supplemental Dulla Declaration"). But, as defendants argue, the filing of the Supplemental Dulla Declaration was improper.[11] Local Civil Rule 65.1(c) requires that an application for a preliminary injunction "be supported by all affidavits on which the plaintiff intends to rely" and that "[s]upplemental affidavits ... may be filed only with permission of the court." Here, plaintiffs did not file a motion for leave to file the Supplemental Dulla Declaration along with their reply papers. Moreover, given that plaintiffs have possessed a copy of the original Harding ESE Report since June 2002, there is little excuse for plaintiffs' failure to submit timely a critique of the report.[12]

In any event, the Supplemental Dulla Declaration does not provide persuasive evidence of irreparable harm. Although counsel for plaintiffs contended at the hearing that Mr. Dulla opines that emissions from the Center Runway Project would exceed 70 tons in 2003, Mr. Dulla in fact makes no such statement in either of his declarations. He merely opines that "the Harding ESE and the Supplemental Harding ESE reports contain serious deficiencies that lead to significant underestimates of the level of PM10 that will be emitted during construction in 2002 and 2003." *See* Supplemental Dulla Decl. ¶ 20. An opinion that the Harding ESE Report and its supplement are erroneous is not

pollutant emissions for a nonattainment area. *See* 40 C.F.R. § 93.152. Notwithstanding other exemptions in 40 C.F.R. § 93.153, actions that are regionally significant require a conformity determination. *See id.* § 93.153(i). Plaintiffs have not argued that the emissions from the Center Runway Project are regionally significant, or that any failure by the FAA to conclude that emissions would be not regionally significant constituted an error requiring a remand to the FAA under the APA.

11.  Phoenix has also moved to strike plaintiffs' 40–page reply brief on the ground that it exceeds the limit of 25 pages permitted under Local Civil Rule 7.1(e). The Court will not strike plaintiffs' reply brief despite plaintiffs' patent failure to abide by the Local Rules.

12.  Plaintiffs argue that they were unaware of the reliance that defendants would place on the Harding ESE Report, and that they did not have a copy of the supplemental Harding ESE Report prior to filing their application for a preliminary injunction. From the outset, however, plaintiffs have had the burden of showing irreparable harm. They would thus have been well-advised to submit evidence in their opening application that levels of emissions for the Center Runway Project would be significant regardless of whether they expected defendants to rely on the Harding ESE Report.

the same as affirmative evidence that the levels of PM10 emissions will exceed 70 tons per year.

Moreover, countering whatever marginal weight the Supplemental Dulla Declaration may carry is a declaration from FAA expert David Kessler concluding that "the Harding ESE Report uses a logical and appropriate methodology to project air emissions for the proposed Center Runway Reconstruction Project." Declaration of David B. Kessler ¶ 12. Mr. Kessler also opines that the Center Runway Project "will not generate air pollutant emissions that exceed the de minimis threshold specified in 40 CFR Part 93 for the various criteria pollutants," *id.* ¶ 15, and "will not create air pollutant emissions that would be regionally significant," *id.* ¶ 7.

Overall then, the Court is left without a firm factual basis upon which to conclude that plaintiffs will be irreparably harmed unless an injunction is granted at this time. Even if plaintiffs could establish that they would be harmed by PM10 emissions, the evidence before the Court is that PM10 emissions from the Center Runway Project will not even reach the threshold (established by the EPA) at which the requirement for a conformity determination becomes applicable. It would be incongruous for the Court to grant a preliminary injunction for the failure to perform a conformity determination where the only alleged harm is from emissions so low that a conformity determination would not normally be required.[13]

### D. Harm to Other Parties and the Public Interest

■ The parties dispute the extent to which a preliminary injunction halting the Center Runway Project might impact PHX's air traffic operations, and thus impact other parties and the public. Ultimately, however, an examination of the interests of other parties and the public confirms that a preliminary injunction should not be granted.

According to evidence submitted by defendants—including declarations from representatives of Southwest Airlines and America West Airlines, two major users of PHX—a delay in the Center Runway Project occasioned by a preliminary injunction will cause significant disruption. During Phase II, the Center Runway must be completely closed for 50 days. Krietor Decl. ¶ 15. Thereafter, in Phase III, the Center Runway will open for 40 days at a length of 7,500 feet—less than its normal operating length of 10,300 feet, and less than the lengths of PHX's North Runway (11,000 feet) and South Runway (7,800 feet). *Id.* ¶¶ 5, 15. Defendants proffer that, in order to minimize the disruption to the National Airspace System and the airlines during Phases II and III of the Center Runway Project, it is important that the Phase II closure occur during the winter, in colder months, defendants submit, less runway length is required than in warmer months for the same aircraft, in-

---

13. Further undermining plaintiffs' case is the fact that they have not been diligent in seeking a preliminary injunction. Although the Center Runway Project began in July 2002, and plaintiffs filed their complaint on October 16, 2002, they did not apply for a preliminary injunction until December 16, 2002—three weeks before the scheduled start of the Phase II runway closure. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987–88 (D.C.Cir.1975) (court's conclusion that preliminary injunc-

tion should not issue was "bolstered" by plaintiff-appellants' 44–day delay in seeking injunctive relief from the time they had become aware of the alleged impairment of their rights). Although plaintiffs provide a plausible explanation for the delay in filing their complaint, they offer little excuse for the two-month lapse between the filing of the complaint and the filing of the application for extraordinary relief.

tervals between flights can be shorter, and usage of PHX is lightest. Flynn Decl. ¶ 18; Declaration of John M. Daley ¶ 8; Declaration of Clifton Childers ¶¶ 6, 11; Krietor Decl. ¶¶ 13, 16.[14] If Phase II does not begin until the summer, defendants argue, burdens from the Project will increase. Due to high temperatures, PHX will only be able to pour PCC at night, thus increasing the costs and extending the time for completing the work. Krietor Decl. ¶ 16. In addition, PHX will not be able to divert certain aircraft to the South Runway because that runway is not long enough to handle takeoffs of heavier crafts when temperatures are hot. Id. ¶ 16; Childers Decl. ¶ 7. This, in turn, will require that more flights be diverted to the North Runway than had otherwise been planned, thereby increasing flight delays and costs and possibly requiring rescheduling or cancellation of flights. Krietor Decl. ¶ 16; Childers Decl. ¶ 7–8. Alternatively, airlines could institute weight restrictions that would enable them to use the South Runway; however, the artificial caps on the number of passengers and the size of fuel loads that might be required, defendants submit, would dig into airline income and require additional fuel stops. Childers Decl. ¶¶ 8–10.

Defendants also argue that the adverse consequences of delay could not be entirely ameliorated by postponing Phase II of the Project until after the 2003 hot-weather season. Krietor Decl. ¶ 17. In the interim period, defendants contend, based on the current status of the Center Runway Project, the Center Runway might remain

unusable except for certain smaller types of aircraft. Id. Thus, larger aircraft would still have to be diverted to the North Runway, possibly resulting in flight delays or cancellations, or in weight restrictions for aircraft that could potentially use the Center or South Runways. Id.; Childers Decl. ¶¶ 8–10.

Plaintiffs, for their part, offer a declaration from a consultant, George Williams, contesting defendants' evidence. Mr. Williams points out that until October 5, 2000, PHX was able to operate with only two runways, and that, since September 11, 2001, operations at PHX have decreased markedly. Declaration of George Williams ¶¶ 2, 13. Mr. Williams opines that "through the use of in-trail arrival spacing programs, speed control on the final approach course, departure sequencing at the runway to avoid in-trail delays, runway use techniques, and through the implementation of other air traffic procedures, the air traffic system can mitigate or eliminate ... reduction in capacity, caused by a runway closure, whether in winter or in summer." Williams Decl. ¶ 9. Indeed, Mr. Williams suggests that during a closure of the Center Runway, even in the summer, heavier and lighter flights can be efficiently allocated between the North and South Runways. Id. ¶ 10.

In evaluating the competing evidence on harms, it must be noted as an initial matter that, like the Supplemental Dulla Declaration, the Williams Declaration was filed on reply without leave of Court, as required under Local Civil Rule 65.1(c). Ac-

---

**14.** Plaintiffs move to strike paragraphs 16 and 17 of the Krietor Declaration on the grounds that Mr. Krietor is not competent to testify to the matters therein. The Court is not persuaded that, particularly in the context of this expedited proceeding, Mr. Krietor—the Aviation Director of PHX, who has "overall re-

sponsibility for management, maintenance, planning and development," Krietor Decl. ¶ 1—is not competent to provide evidence as to the specific considerations involved in planning the Center Runway Project and how the capacity of PHX will be affected by the Project.

cordingly, the Williams Declaration is not properly before the Court.

In any event, however, the Court is not persuaded that harms to other parties and the public interest favor granting an injunction at this time. Although the Court is not well-positioned to evaluate the conflicting conclusions of the parties' declarants, on the whole, the Court finds more persuasive defendants' evidence that runway closure during the warmer months, when the airport is busiest and when the South Runway cannot readily accommodate certain aircraft, will impose a greater burden on outside parties. Indeed, there is no dispute that PHX staff (together with interested airlines) intentionally tailored and managed the construction schedule so that Phase II would occur during the light winter traffic season. Krietor Decl. ¶ 13; Daley Decl. ¶ 8; Childers Decl. ¶ 11. Logically, then, a shift in that schedule will create burdens for the public and the airlines that PHX serves.

Moreover, even if the Court were to agree with Mr. Williams that reduction in capacity during the summer months could be "mitigate[d] or eliminate[d]," Williams Decl. ¶ 9, plaintiffs have still not demonstrated that the balance of harms favors granting an injunction. The Center Runway remains in a degraded condition, and will be improved by resurfacing with PCC. *See* Declaration of Candace Huff ¶ 7; Krietor Decl. ¶ 10. Timely attention to the deteriorated condition of the Center Runway is in the public interest.[15] And although some PM10 will be released by the Project and these emissions could potentially reach citizens in neighboring communities, as noted above, the evidence shows that the emissions will be below the threshold levels set by the EPA.

### E. Balancing the Factors

"[B]alanc[ing] the strengths of the requesting party's arguments in each of the four required areas," *CityFed Fin. Corp.*, 58 F.3d at 747, it is clear that plaintiffs' application for a preliminary injunction must fail. Plaintiffs have not demonstrated a substantial likelihood of success on the merits, nor have they made a persuasive showing that they will be irreparably harmed if a preliminary injunction is not granted. Moreover, while the evidence concerning the interests of other parties and the public is conflicting, on the whole it suggests that granting an injunction at this time will be disruptive to airlines and passengers. Thus plaintiffs have not established that the "extraordinary and drastic remedy" of a preliminary injunction is warranted. *See Mazurek*, 520 U.S. at 972, 117 S.Ct. 1865.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' application for a preliminary injunction is denied as to all defendants. An order denying plaintiffs' application was issued by this Court on January 3, 2003.

---

**15.** Mr. Williams agrees that the Center Runway "may not be in prime condition," but asserts that it is not in a dangerous condition. Williams Decl. ¶ 12. Notably, he does not contend that he has recently examined the Center Runway.